UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------
UNITED STATES OF AMERICA,

v.

**ANNIE GEORGE, a/k/a,
ANNIE KOLATH, a/k/a,
SAJIMOL GEORGE**

          Defendant.

-------------------------------------------------

*TRIAL MEMORANDUM*

Crim. No. 12-CR-208 (GLS)

(Hon. Gary L. Sharpe)

## I. *STATEMENT OF THE CASE*

A. Jury selection is scheduled to commence at the discretion of Chief United States District Judge Gary L. Sharpe on July 30, 2012, in Albany, New York.

B. Defendant, Annie George is released on conditions.

C. Jury trial has not been waived.

D. The estimated duration of trial is approximately three days.

E. The Indictment charges the defendant as follows:

| Count Charged | Description | Violation |
|---|---|---|
| One | Harboring of an Illegal Alien for Private Financial Gain | 8:1324(a)(1)(A)(iii) (B)(i) & 18:2(b) |

F.     Expert witness: None

G.     Other potential witnesses:

Rahul Sur, New York, New York
HSI S/A Daria Botten, ICE Albany
HSI S/A Don O'Brien, ICE Albany
V.M., Capital District

Shai Thomas, Congers, New York
Chinamma George, Jericho, New York
Tom George, Jericho, New York
Shiju Mathai, India
USDOL S/A David Gerrain, DOL Albany
Nichole Yungandreas, Catskill, New York
B. Padmanabhan
Brenda Tate, Philadelphia, Pennsylvania
Malayalam Interpreter (TBD)

## *II. STATEMENT OF FACTS*

Between about October 2005 and May 3, 2011, defendant Annie George, a/k/a Annie Kolath, a/k/a Sajimol George,[1] is alleged to have harbored V.M. in the NDNY. The genesis of the case against Ms. George occurred when V.M.'s adult son, Shiju Mathai (no relation to Ms. George or her now deceased husband Mathai Kolath George) contacted, in about March 2011, the National Human Trafficking Resource Center (NHTRC) (also known as the "Polaris Project") - an agency that assists in the recovery of victims of human trafficking. Generally, Shiju Mathai (who at the time was living in India) communicated to NHTRC that his mother was working as a domestic servant for Ms. George at Ms. George's residence at 708 Riverview Road in Rexford, New York, and that his mother needed to be rescued from what were alleged to be overly arduous working conditions. Once in receipt of the allegations, the NHTRC made a referral to special agents with the Department of Homeland Security Office in Albany, New York.

Agents with Homeland Security Investigations began their investigation in about April 2011 and learned that V.M. was a widowed, middle-aged woman who was a citizen of India. Agents also learned that V.M. had come to the United States in about 1998 on a G5 visa which permitted her to

---

[1] Ms. George's first name at birth was Sajimol. When Ms. George immigrated from India to the United States and married Mathai Kolath George, she became known as either Sajimol George, Annie George or Annie Kolath.

2

work in the United States as a domestic servant for a family associated with the United Nations (the Sur family).[2] A G5 visa is a nonimmigrant visa given to individuals who work as attendants, servants or personal employees of G4 visa holders. If a G5 visa holder leaves the employ of the individual holding the G4 visa, the G5 visa holder is then out of lawful immigration status in the United States. Homeland Security Investigations agents further determined that V.M. had been working for Rahul Sur and his family in New York City as a domestic servant responsible for cooking, cleaning, child care, etc. from 1998 until October 2005. In October 2005, V.M. left the employ of the Sur family without notice or explanation and had not been seen or heard from since. Additional steps were then taken to confirm that V.M. was now living and working at Ms. George's residence in Rexford.

Once investigators were confident that V.M. was living and working for Ms. George at her Rexford, NY residence, investigators executed a recovery operation on May 3, 2011. Investigators first arrived at Ms. George's Rexford residence around 11 a.m. Investigators knocked on the front door wherein Ms. George's friend/assistant Nichole Yungandreas answered. Investigators identified themselves and asked to speak to V.M. Ms. Yungandreas stated that she did not know V.M. and that the owner of the house, Ms. George, was busy in a meeting. Investigators showed Ms. Yungandreas a picture of V.M. and Ms. Yungandreas responded that she had seen V.M. before, but that V.M. was

---

[2] Investigators also learned that Rahul Sur and his family were lawfully in the United States, working for the United Nations in New York City, pursuant to their G4 visas. A G4 visa is a nonimmigrant visa that allows the holder to remain in the United States indefinitely as long as the holder is conducting duties as specified in the visa.

3

not in the residence. Investigators told Ms. Yungandreas that they knew V.M. was in the residence.[3] Ms. Yungandreas said she would need to speak with Ms. George and then shut the door.

About ten minutes later Ms. Yungandreas returned, opened the door and said that Ms. George was busy with an important meeting, did not have time to speak with investigators, and that the investigators should come back at a later time. The investigators again indicated that they knew V.M. was in the residence and that they would not be returning at a later date. Ms. Yungandreas again shut the door. At approximately 11:20 a.m., Ms. Yungandreas again opened the door and handed investigators a slip of paper bearing Ms. George's attorney's name and telephone number. Ms. Yungandreas said the attorney would be arriving soon, and then shut the door.

The investigators then contacted the U.S. Attorney's Office in Albany and provided Ms. George's attorney's contact information. A telephonic conversation was had between the U.S. Attorney's Office and Ms. George's attorney, and shortly thereafter, investigators learned that V.M. would be permitted to leave Ms. George's residence. At approximately 11:46 a.m., investigators observed a side door to Ms. George's residence quickly open, saw V.M. exit, and watched the door immediately close. V.M. was not in possession of any of her personal belongings. Investigators then began to interview V.M. on the terrace of Ms. George's residence. Investigators learned that V.M. had all of her clothes and personal possessions packed in bags inside of Ms. George's residence.

Several minutes later, investigators heard Ms. Yungandreas speak through a closed window facing the terrace and say that V.M. should go with investigators and that V.M.'s belongings would

---

[3] In either late April or early May, V.M. had been in telephonic contact with the NHTRC and had advised that she would be in the residence on the morning of May 3, 2011.

be sent at a later time. Investigators told Ms. Yungandreas that V.M. would not be leaving without her personal possessions. Ms. Yungandreas walked away from the window and about ten minutes later the side door to the residence quickly opened and Ms. Yungandreas tossed a black duffel bag onto the ground and then promptly closed the door.

At approximately 12:20 p.m., some of Ms. George's attorneys arrived at the scene. Investigators asked the attorneys for permission to enter the residence to ensure that they were in possession of all of V.M.'s clothes and personal effects. The attorneys then entered the residence. At approximately 12:38 p.m., Ms. Yungandreas opened the side door and placed two suitcases and a cardboard box containing V.M.'s clothes and personal effects onto the ground. Ms. George's attorneys then permitted Special Agent Botten and V.M. to enter the residence and view the area where V.M. indicated she kept her personal belongings. Once V.M. indicated she believed that all of her bags/suitcases had been removed from the residence, investigators exited the residence and left the premises with V.M.[4]

During the days and weeks following V.M.'s removal from Ms. George's Rexford residence, V.M. was questioned about her employment with the Sur and George families. In summary, V.M. told investigators that she had worked for the Sur family in New York City from about 1998 through October 2005, earning approximately $250-$350 per month, as the Sur family's domestic servant. In October 2005 a man approached her while she was working for the Sur family in New York City.

---

[4] Once V.M. had been recovered from Ms. George's residence and had been placed in a safe facility, V.M. unpacked her bags and realized that a diary she had maintained while working for the George family was missing. V.M. was sure the diary had been packed in her personal possessions as it contained a record of the payments the Georges had made to her and a record of the monies she was still owed (believed to be about $40,000.00).

V.M. did not know the man, but he spoke Malayalam (a dialect of Hindi), claimed to be from V.M.'s village in India, and said that she should come with him. Prior to meeting this unidentified man, V.M. apparently had had conversations with some of the members of her church who urged her to get married. The man convinced V.M. to leave the Sur family and travel with him to a residence in upstate New York. Although V.M. did not know where she was taken, it appears that V.M. was taken to a residence in Catskill, New York.

At the residence in Catskill, New York, V.M. met Ms. George and Ms. George's husband, Mathai Kolath George. Prior to this meeting, V.M. had never met, nor heard of, either Ms. George, her husband, or the George family. According to V.M., Mathai George told her that the man who brought her to the residence in Catskill, New York was not of upstanding character, and that she should not pursue any type of personal relationship with the man. Ms. George and her husband then offered to pay V.M. $1,000 per month if she would work for them as a live-in domestic servant. V.M. agreed and was transported to Ms. George's Catskill, New York residence where she began caring for Ms. George's minor children,[5] cooking, and cleaning, etc. The agreement between V.M. and Ms. George was entirely oral and no employment paperwork, such as an I-9 form or W-2 form were prepared. V.M. never contacted the Sur family to advise them of her whereabouts or decision to leave their employ. V.M. never sought to adjust or change her visa / immigration status.

From October/November 2005 through May 3, 2011 (the day of her removal by HSI investigators) V.M. worked as the live-in domestic servant for Ms. George and her family. V.M.

---

[5] During V.M.'s tenure with Ms. George and her family, V.M. cared for up to six of the defendant's minor children at one time. Tragically, Ms. George's husband and eldest son were killed in a plane crash on June 14, 2009.

6

worked for the George family at their Catskill, New York home, and then when the family moved to a larger home in Menands, at the George home in Menands. V.M. then went with the George family when they moved, sometime in August 2008, to the Rexford residence - the same residence where V.M. was removed on May 3, 2011.

V.M.'s employment with Ms. George lasted approximately 66 months. During that 66 month period, V.M.'s daily routine began at approximately 5:30 a.m. and concluded between 11:00 p.m. and midnight. V.M. worked seven days per week, 365 days per year and was not permitted to take any days off. V.M. received her daily taskings from Ms. George. V.M. was only permitted to go outside of the residence(s) if all of the work was done - a situation that rarely, if ever, occurred. V.M. was not allowed to speak to guests in Ms. George's home(s) beyond the exchanging of pleasantries. Although Ms. George never forbade V.M. from leaving the residence(s), V.M had no driver's license, no bank account, no passport, no identification documents, no money, no Internet access, and spoke limited English.[6] During her 66 month tenure with Ms. George, V.M. never went to a doctor or dentist. V.M. would occasionally ride with Ms. George and her family to the local Wal-Mart where she would be tasked with looking after the children while the family was inside of the store.[7]

Since V.M. did not have a bank account, she asked Ms. George to send her earnings to her children in India via check or Western Union money transfer. V.M. has maintained that of the

---

[6] V.M. was permitted, during her off-duty time, to use a calling card to telephonically communicate with her sons in India.

[7] Ms. George would occasionally purchase sundry items for V.M., but would deduct the cost from the monies due and owing to V.M.

7

$66,000 that Ms. George should have paid her during her tenure as the domestic servant for the George family, she has been paid only approximately $26,000 or $27,000. The payments by Ms. George to V.M. were sporadic. V.M. repeatedly asked Ms. George to send her earnings to her children but was frequently met with excuses from Ms. George as to why a payment could not be made - V.M.'s sons would just waste the money so Ms. George would hold the money for her, or there was no money to pay V.M., etc.[8]

In or about 2008, V.M. asked Ms. George if she could fly home to India to attend the wedding of her eldest son. Ms. George told V.M. that that would not be possible because V.M. did not have any immigration or identification documents to show airline personnel. Sometime in 2009 Ms. George told V.M. that she would use $4,000 of V.M.'s earnings and go to an immigration lawyer to help V.M. get immigration papers. V.M. went with Ms. George to a meeting with an unknown lawyer who purportedly would help V.M. V.M. watched Ms. George pay the lawyer $4,000 in cash. This first, and only, meeting with the lawyer lasted less than an hour, and produced no change in V.M.'s immigration status.

In about November 2008, Ms. George hired Shai Thomas to assist V.M. with the domestic duties at the Rexford residence. Ms. Thomas was a citizen of India who possessed lawful immigration status in the United States. Ms. Thomas agreed to work as a live-in domestic servant for $1,000 per month. Ms. Thomas remained in Ms. George's employ until about August 2009 when she quit. Ms. Thomas had many of the same duties and hours as V.M. Ms. Thomas was present for

---

[8] Ms. George's husband had a $5,000,000 life insurance policy with Prudential Life Insurance. On or about September 15, 2009, Ms. George's claim for benefits in connection with her husband's death was approved and she received the proceeds from the policy.

8

a conversation between V.M. and Ms. George wherein V.M. expressed a desire to make a visit to India. Ms. Thomas heard Ms. George tell V.M. that she could not go back to India because she had no immigration documents, and that if she tried to leave the United States, "immigration" would find her without any papers.

V.M. eventually came to believe that Ms. George was never going to pay her the monies she was due. V.M. was unsure of how to extricate herself from Ms. George's employ and in about April 2011 sought the assistance of the National Human Trafficking Resource Center (NHTRC) (also known as the "Polaris Project"). As discussed above, the NHTRC provided a tip to investigators with the Albany HSI Office which led to V.M.'s recovery on May 3, 2011.

Sometime between V.M.'s removal and about June 30, 2011, V.M.'s son, Shiju, recorded three telephonic conversations with Ms. George.[9] The general topic of the conversations is V.M.'s tenure with, and removal from, Ms. George's employ. No one from the government was aware of these conversations, or that they had been recorded, until Shiju communicated the existence of the recorded calls to investigators. The three calls are in Malayalam and cumulatively run approximately 61 minutes. The three calls have been transcribed into English, and the three transcripts are cumulatively 41 pages. The government will seek to admit at trial portions of the first and second recorded phone calls - totaling approximately 16 pages of transcript.

---

[9] Additionally, between August 8, 2008 and October 20, 2010 the defendant exchanged a small number of e-mails with Shiju Mathai using the e-mail account "kolathannie@yahoo.com". The contents of the e-mails range from the innocuous such as the defendant writing that V.M. "has a wonderful life here, that she never had or even seen or heard about" to the defendant telling Shiju that "we will find a solution for your matter" and "I understand. Will work on it." in reference to Shiju's request for money to be sent to India.

9

U.S. Department of Labor Special Agent David Gerrain has performed wage and hour calculations in this case. Based upon the hours V.M. is believed to have worked, and her starting and ending dates, S/A Gerrain was able to determine, using the prevailing minimum hourly wage rates and overtime hourly wage rates, what an employer would have to have paid a domestic servant working under the same conditions as V.M. On the conservative end of the spectrum, assuming V.M. worked 'only' 17.0 hours per day from November 1, 2005 through May 2, 2011, she would be due, assuming she was paid at the minimum hourly wage rate for the entire duration, over $240,000 in regular time wages and over $79,000 in overtime wages. On the far side of the spectrum, assuming V.M. worked 18.5 hours per day from November 1, 2005 through May 2, 2011, she would be due, assuming she was paid at the minimum hourly wage rate for the entire duration, over $256,000 in regular time wages and over $87,000 in overtime wages.

### III. *RELEVANT LAW CONCERNING THE ALIEN HARBORING OFFENSE*

The essential elements of Count One are relatively straightforward and the break down of the elements with associated definitions are contained in the Government's Proposed Jury Instructions.

### IV. *EVIDENTIARY ISSUES*

#### A. *Recorded Conversations and E-mails (Hearsay and Authenticity Issues):*

Recordings of conversations are direct evidence of the contents of the conversations. Recorded statements of a defendant are admissible against the defendant in that such conversations are admissions by the defendant. *See* Rule 801(d)(2), Fed.R.Evid. Admissions are not hearsay.

Fed.R.Evid. 801(d).[10]

A participating witness' portions of conversations with Ms. George are admissible to render what Ms. George said intelligible. *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (admission of tape recorded conversations between CI and defendant properly admitted; "The statements of the CI were not offered to prove the truth of the matters asserted but only to render what [defendant] said in these conversations intelligible. There was thus no admission of hearsay evidence. *See* Fed. R. Evid. 801(c); [further citations omitted])." *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002) (statements of informant in recorded conversation with defendant admissible to provide context to defendant's statements) (citing cases); *see also United States v. Burt*, 495 F.3d 733, 739 (7th Cir. 2007) (statements of the informant in the recordings may also be admitted not for the truth of the matter asserted in the communication, but to show the relationship between the parties and to provide context to the communications).

Moreover, a participant in the conversation may testify to his understanding of various statements made in a conversation. *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006); *United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992).

There are at least two ways in which tapes may be authenticated - testimony from a participant in a conversation, or testimony establishing a chain of custody. *See United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) (noting tapes may be authenticated either by

---

[10] The defendant's communications in e-mails would likewise be admissible as admissions of a party opponent.

"establishing a chain of custody," or by "testimony by a contemporaneous witness").[11]

### B. *A Transcript of an English or a Foreign Language Conversation May Be Admitted In Evidence Provided That Each Party Agrees To Its Accuracy Or Has An Opportunity to Submit a Competing Version*

In connection with its notification to the defense of the portions of the consensually recorded tapes it intended to play, the government made the following request:

> Please advise (a) whether you have an alternative transcription or translation of the selection so that we may produce an "official" or "stipulated" transcript; *see United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004); *United States v. Le*, 256 F.3d 1229, 1238 (11th Cir. 2001); *United States v. Howard*, 80 F.3d 1194, 1199 (7th Cir. 1996); *United States v. Llinas*, 603 F.2d 506, 509 (5th Cir. 1979); and (b) whether you believe there are additional portions of the tapes which ought in fairness be considered contemporaneously with them. *See United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); Fed. R. Evid. 106.

So long as the parties agree to the accuracy of a transcript, or are permitted to provide competing versions to the jury, it is proper for a trial court to admit both the tape and the transcript into evidence. *United States v. Carson*, 464 F.2d 424, 436-37 (2d Cir. 1972) (approving procedure for transcript of English language conversations). "Where the recorded conversation is conducted in a foreign language, an English language transcript may be submitted to permit the jury to understand and evaluate the evidence." *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001); *United States v. Bahadar*, 954 F.2d 821, 830 (2d Cir. 1992) (where tape of conversation was in Urdu and Punjab, and English translation was made, approving procedure in which informant read his own side of conversation from transcript and AUSA read defendant's side of conversation from

---

[11] E-mails can be authenticated by circumstances within the e-mail identifying the sender of the electronic communication (e.g. the sender's e-mail address, the author's signature, the content of the communication, etc.). *See United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000).

transcript); *see id.* at 830-31 ("We see no abuse of discretion in Judge Bartels' handling of the mostly-foreign tape-recorded evidence; on the contrary, we find it hard to imagine any other proper and effective handling of this evidence."); *United States v. Chalarca*, 95 F.3d 239, 246 (2d Cir. 1996); *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985).

If the defense contests the accuracy of any portion of the offered transcript, it may submit its own version. *Ben-Shimon*, 249 F.3d at 101; *Carson*, 464 F.2d at 436-37.

Translations need not be verbatim, and indeed, idioms and slang should be translated so that they make sense in English. *United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004), *cert. granted*, 543 U.S. 1107 (2005) (judgment vacated, case remanded for further consideration in light of *United States v. Booker*, 543 U.S. 220 (2005)). The Court should consider a jury instruction similar to Seventh Circuit Pattern Instruction 3.18, which advises the jury, in substance, that whether a transcript is an accurate translation is for the jury to decide, and that the jury should consider how and by whom the transcript was made, the knowledge, training and experience of the translator, as well as the nature of the conversation and the reasonableness of it in light of all the evidence in the case. *See United States v. Gutierrez*, 367 F.3d 733, 736 (8th Cir. 2004).

Any qualified person, including a cooperator in the case, or a government translator, if qualified in the language, is capable of making the translation. *United States v. Ben-Shimon*, 249 F.3d at 101 (cooperator); *United States v. White*, 219 F.3d 442, 448-49 (5th Cir. 2000) (FBI agent).

The Government does not intend to play the 61-plus minutes of tapes in their entireties; rather, the Government will prepare and offer "composite" tapes consisting of selected pertinent conversations, a well accepted practice. *See United States v. Bakkar*, 925 F.2d 728, 736-37 (4th Cir.

13

1991) (admission into evidence of 11 composite tapes from 200 hours of videotape proper pursuant to Fed. R. Evid. 1006, even without admitting the 200 hours of original tapes in evidence); *see also United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994) (composite is admissible when it saves trial court time and inconvenience and prosecution has laid proper foundation on accuracy and authenticity of composite); *United States v. Rengifo*, 789 F.2d 975, 979 n. 3 (1st Cir. 1986) ("This court has long upheld the use of composite tapes as evidence."); *United States v. Denton*, 556 F.2d 811, 815-16 (6th Cir. 1977).

The Government has identified the portions it intends to offer in its case-in-chief, and has invited defense counsel to specify those portions, if any, which ought in fairness to be considered contemporaneously under the rule of completeness. *See* Fed. R. Evid. 1006. In *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) where the government offered in evidence a 90-second portion of a 42 minute long tape, the district court denied a defense request that the remainder of the tape be admitted pursuant to the rule of completeness. *Id.* at 73. The Second Circuit upheld this ruling, explaining that an "omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *Id.* (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)). The Second Circuit noted that "[t]he completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Id.* (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). "[T]he party urging admission of an excluded conversation must 'specify the portion . . . that is relevant to the issue at trial and that qualifies or explains portions already

admitted." *United States v. King*, 351 F.3d 859, 866 (8th Cir. 2003) (citing *United States v. Webber*, 255 F.3d 523, 525 (8th Cir. 2001) (quoting *United States v. Sweiss*, 814 F.2d 1208, 1212 (7th Cir. 1987)).

### C. *Use of a Malayalam Interpreter:*

At least two government witnesses, V.M. and her son Shiju Mathai, speak Malayalam as their native language. V.M.'s English is limited and she will require the use of an interpreter while on the witness stand. Shiju Mathai may be more comfortable testifying in Malayalam. Use of an interpreter is permissible under Rule 604, Fed.R.Evid. As of the date of this memorandum, the government was still making arrangements to retain a qualified interpreter.

### V. *CONCLUSION*

Through this trial memorandum the Government has attempted to summarize those principles of law which we believe to be applicable in resolving issues that the Court may face during trial. We respectfully request an opportunity to submit additional legal authority in connection with such other issues as may arise.

Dated: July 16, 2012
Albany, NY

Respectfully submitted,

RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

BY: *s/Richard Belliss*
RICHARD BELLISS
ASSISTANT U.S. ATTORNEY
(Bar No. 515295)

15